BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: ACETAMINOPHEN – ASD/ADHD PRODUCT LIABILITY LITIGATION | MDL DOCKET NO. _____ |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION TO TRANSFER ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS

### INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 6.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("the Panel"), Movant Aujenai Thompson, Individually and as Guardian Ad Litem of J.D., a minor, ("Plaintiff") respectfully submit this brief in support of her motion to transfer for coordination of pretrial proceedings to a single District Court selected by this Panel all active cases identified in the Schedule of Actions, as well as any subsequently filed cases involving similar facts or claims arising from the diagnosis of autism spectrum disorder ("ASD") or attention-deficit/hyperactivity disorder ("ADHD") from prenatal exposure to Acetaminophen ("APAP"), also known as Paracetamol.

The nineteen (19) actions identified in the Schedule of Actions ("the Actions") are brought by individuals who suffer from ASD or ADHD as a result of prenatal exposure to APAP. The Actions name as defendants numerous manufacturers and sellers of APAP, including Costco, CVS, Walgreen, Safeway and Wal-Mart ("Defendants"). The Actions, as discussed further below, assert common claims based upon common factual allegations. No discovery has taken place in any of the Actions and no substantive rulings have been made. Plaintiffs anticipate, moreover, that a multitude of tag-along actions are likely to be filed soon and for an indefinite period into the future.

Coordination of the Actions would facilitate coordinated discovery, is necessary to avoid inconsistent pretrial rulings, and would promote judicial efficiency. The Actions, in sum, are perfect candidates for coordinated pretrial proceedings.

Transfer for centralization and coordination is proper and appropriate because the Actions (and each of the myriad tag-along actions that movant expects will shortly be filed) share common operative facts, allege the same or similar wrongful conduct, require resolution of the same factual questions, involve the same scientific and medical evidence, and will each require discovery into these shared allegations and operative facts. The claim that the defendants failed to warn plaintiffs that prenatal use of the defendants' APAP products could result in plaintiffs' ASD and/or ADHD is central to each of the Actions. Each action alleges the same misconduct led directly to the marketing and sale of the same harmful product to each of the similarly situated plaintiffs, ultimately causing each individual plaintiff to suffer the same devastating neurodevelopmental disorders. The underlying facts concerning the manufacture, marketing, and sale of APAP are common to and uniform throughout the Actions. The resolution of each case will require extensive discovery, involving many of the same documents and witnesses, into the development, manufacture, marketing, and sale of APAP, as well as into each defendant's knowledge of the risks associated with prenatal exposure to APAP.

Centralizing the Actions before one judge at the nascent stage of this litigation will thus promote the just and efficient conduct of this litigation, prevent inconsistent pretrial rulings and duplicative discovery, and thereby conserve the resources of the judiciary, the parties, and their counsel. Resolving common questions of law and fact in a consistent manner through transfer and coordination is the raison d'être of 28 U.S.C. § 1407. And consolidating the Actions, and having these common questions resolved by one court, will advance those aims. Accordingly, Plaintiffs

respectfully request that this Panel issue an order centralizing the Actions, as well as all future tag-along actions, before a single District Court selected by this Panel.

**BACKGROUND**

The plaintiffs in the Actions have filed at least nineteen (19) civil actions arising from their purchase and use of APAP during pregnancy. The Actions all allege that the plaintiffs purchased and used APAP while pregnant. While each individual action may assert different state law claims or seek individual damages for personal injuries, they all rest on a common core of facts and share a set of essential characteristics. Each Action alleges that: (1) plaintiffs purchased and used APAP while pregnant; (2) APAP interferes with fetal development, (3) plaintiffs chose to take APAP during their pregnancies because Defendants marketed APAP as a safe pain reliever for pregnant women; (4) Defendants knew or should have known that prenatal exposure to APAP can cause ASD or ADHD; and, (5) Defendants failed to warn pregnant consumers about and otherwise concealed from them the dangers posed by prenatal use of APAP from these most vulnerable consumers.

APAP holds a uniquely preeminent place in pharmacology and medicine. A popular over-the-counter drug that is used to reduce fever and relieve mild to moderate pain, APAP is one of the most commonly used medications in the country. Around 50 million American consumers (roughly 20% of the adult population in the United States) use products containing APAP each week, with more than 25 billion doses being used annually. *Acetaminophen Risks*, AMERICAN LIVER FOUND. (May 20, 2020), https://bit.ly/3aL1jB3. It is available for purchase under the house brand names of most major grocery and drug stores.

At the same time, it is, paradoxically, probably one of the most dangerous and least understood compounds in medical use. APAP's mechanism of action remains unclear. Scientists

have yet to figure out how APAP relieves pain and reduces fever. In the United States alone, moreover, 82,000 emergency room visits and 26,000 hospitalizations are attributed to the use of acetaminophen annually. *See* Jessica B. Rubin, et al., *Acetaminophen-induced Acute Liver Failure is More Common and More Severe in Women*, 16 CLIN GASTROENTEROL HEPATOL 1 (June 2018), https://bit.ly/3aC6gMx. Indeed, acetaminophen toxicity is the leading cause of acute liver injury and acute liver failure in the United States, accounting for approximately 50% of all acute liver failure cases. *Acute Liver Failure*, UCSF TRANSPLANT SURGERY: DEP'T OF SURGERY (last visited June 7, 2022), https://bit.ly/3NreAxd.

Despite the drug's unknown mechanism of action, APAP has long been marketed to pregnant women as the safest pain reliever and fever-reducing drug for use during pregnancy. Indeed, it has been marketed as the *only* over-the-counter pain relief drug on the market appropriate for use during pregnancy. It is not surprising, then, that despite their demonstrated reluctance to use medications during pregnancy, approximately 65% of pregnant women in the United States use APAP. Ann Z. Bauer, et al., *Paracetamol Use During Pregnancy – A Call for Precautionary Action*, 17 NATURE REVIEWS ENDOCRINOLOGY 757 (Dec. 2021), https://go.nature.com/3NwJ0Os. Indeed, APAP is used by pregnant women more than any other prescription or over-the-counter medicine.

Over the past decade, a growing body of scientific studies have raised increasingly more and greater concerns about the correlation between prenatal APAP exposure and adverse neuro-developmental outcomes. Twenty-six separate observational studies have identified positive associations with APAP exposure during pregnancy and ASD or ADHD. The 16 studies that specifically investigated dose-response identified a dose-response association, meaning increased duration of exposure to APAP was associated with increased risk.

One of the most significant studies, published in the leading scientific journal *JAMA Psychiatry* in 2020,[1] found that umbilical cord "biomarkers of fetal exposure to acetaminophen were associated with significantly increased risk of childhood ADHD and ASD in a dose-response fashion."[2] The study's authors further noted that "[s]ensitivity analyses . . . and subgroup analyses found consistent associations between acetaminophen and ADHD and acetaminophen and ASD across strata of potential confounders, including maternal indication, substance use, preterm birth, and child age and sex."[3] Finally, the authors concluded that their findings "support previous studies regarding the association between prenatal and perinatal acetaminophen exposure and childhood neurodevelopmental risk and warrant additional investigations."[4]

ASD is a multifactorial neurodevelopmental disorder characterized by persistent deficits in social communication and social interaction and elevated repetitive behaviors, in which various circuits in the sensory, prefrontal, hippocampal, cerebellar, striatal, and other midbrain regions are perturbed. Symptoms are present early in development, often noticed within the first two years of life, and impact the individual's social, occupational, and/or other important areas of daily life.

There are three levels of ASD, ranging from least to most severe, with ASD level 3 describing an individual who has the most severe level of ASD symptoms. A person with level 1 ASD requires support and has noticeable communication impairments making it difficult to communicate appropriately with others. A person with ASD level 1 is likely able to communicate verbally but may have trouble engaging in back-and-forth conversation with others. Making and

---

[1] Ji, Y. et al., *Association of Cord Plasma Biomarkers of In Utero Acetaminophen Exposure With Risk of Attention-Deficit/Hyperactivity Disorder and Autism Spectrum Disorder in Childhood*, 77 JAMA PSYCHIATRY 180, 180–189 (Feb. 2020).
[2] *Id.* at 180.
[3] *Id.* at 183.
[4] *Id.* at 188.

keeping friends may not come easily or naturally to them. Inflexibility of behavior causes significant interference with functioning in one or more contexts, including difficulty switching between activities. Problems of organization and planning hamper the individual's independence. People with ASD Level 2 require substantial support; they may or may not communicate verbally, and they require extensive support in order to participate in social activities. People with ASD level 2 tend to have very narrow interests and may engage in odd repetitive behaviors that can make it difficult for them to function in certain situations. Finally, people with ASD level 3 will have many of the same behaviors as those with levels 1 and 2, but to a more extreme degree. They require very substantial support to learn skills important for everyday life. Many individuals with ASD Level 3 do not communicate verbally or may not use many words to communicate. They also have restrictive or repetitive behaviors that often impede their ability to function independently and successfully in everyday activities. The Center for Disease Control (CDC) currently estimates that about 1 in 44 8-year-old children have been identified with ASD, and there is no cure for ASD. *Autism Spectrum Disorder (ASD)*, CDC (last visited June 7, 2022), https://bit.ly/39aYZmg.

ADHD is one of the most common neurodevelopmental childhood disorders. The CDC estimates that 9.4% of American children (6.1 million) have been diagnosed with ADHD. *Attention-Deficit / Hyperactivity Disorder (ADHD)*, CDC (last visited June 7, 2022), https://bit.ly/3MpQD88. There is currently no cure for ADHD, and the condition often lasts into adulthood. People with ADHD show a persistent pattern of inattention and/or hyperactivity–impulsivity that interferes with functioning or development. Individuals with ADHD are more likely to experience difficulties with all types of relationships (friendships, romantic, familial, etc.).

ADHD symptoms can cause difficulty at school, at work, and at home. In most cases, ADHD is best treated with a combination of behavior therapy and medication.

Plaintiffs residing in California, Washington, Nevada, Missouri and Arkansas have already brought suit in federal court and all assert claims based on the same set of operative facts: mothers ingested Defendants' acetaminophen products while pregnant based on the belief it was safe for in utero consumption, and it caused ASD and/or ADHD in their children. Defendants are also dispersed across the country. Numerous different defendants, including Costco, CVS, Walgreen, Safeway and Wal-Mart, have been named in the Actions. Their principal places of business are located in at least five (5) States, from Rhode Island to Washington. Specifically, Defendants come from:

| Defendant | State or Country of Principal Place of Business | State of Incorporation |
|---|---|---|
| Costco Wholesale Corporation | Washington | Washington |
| CVS Health Corporation | Rhode Island | Delaware |
| Walgreens Boots Alliance, Inc. | Illinois | Delaware |
| Wal-Mart Stores, Inc. | Arkansas | Delaware |
| Safeway, Inc. | California | Delaware |

Although the prenatal use of APAP has surely injured pregnant women and children in every state, and follow-on actions will almost certainly be brought in every state, c consolidating the Actions for coordinated pretrial proceedings before a single District Court selected by this Panel is appropriate.

7

## ARGUMENT

### I. Transfer To One District Court for Consolidation and Coordination Is Appropriate Under 28 U.S.C. § 1407.

The creation of a multidistrict litigation ("MDL") is appropriate here because "civil actions involving one or more common questions of fact are pending in different districts" and transfer will serve "the convenience of parties and witnesses" and "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). "Centralization [permits] all actions to proceed before a single transferee judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007).

In only weeks, nineteen (19) actions in this litigation have been filed in at least seven (7) districts. There are surely many, many more to come. Given the nature of this case, the number of pending actions and the rate at which they are being filed in federal courts throughout the country, the alternative to transfer and coordination is "multiplied delay, confusion, conflict, inordinate expense and inefficiency." *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 495 (J.P.M.L. 1968). Indeed, the inevitability of inconsistent judicial rulings affecting what will surely be tens, perhaps hundreds of thousands of plaintiffs and the same stable of defendants is precisely why Section 1407 was enacted. *See* H.R. Rep. No. 1130, 1899, 1901, 90th Cong., 2d Sess. 1 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898) (consolidation and coordination "assure(s) uniform and expeditious treatment in the pretrial procedures in multidistrict litigation" and avoids "conflicting pretrial discovery demands for documents and witnesses" that might "disrupt the functions of the Federal courts.").

## A. The Actions Involve Common Questions of Fact, and Centralization of the Actions Will Minimize the Risk of Inconsistent Rulings.

The first requirement under 28 U.S.C. § 1407 for transfer and centralization of multiple actions is the presence of common questions of fact, because transfer and pretrial coordination of actions sharing common questions of fact "conserve[s] the resources of the parties, their counsel, and the judiciary." *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liab. Litig.*, 254 F. Supp. 3d 1381, 1382 (J.P.M.L. 2017). Section 1407 does not require, however, a "complete identity or even [a] majority" of common questions of fact to justify transfer. *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004); *See also In re: Rembrandt Techs., L.P., Patent Litig.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007) ("Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer."); *In re Flat Glass Antitrust Litig. (No. II)*, 559 F. Supp. 2d 1407, 1408 (J.P.M.L. 2008) (all actions alleged similar conspiracy against defendants; centralization in Western District of Pennsylvania was appropriate).

Transfer and centralization are appropriate in this case given the substantial commonality of questions of fact and law. Here, the Actions are brought by plaintiffs who allege both that prenatal exposure to APAP is responsible for their ASD or ADHD diagnosis and that the Defendants' labeling and marketing of their APAP products failed to warn pregnant women that prenatal APAP exposure is associated with and causes the neurodevelopmental harms of ASD and/or ADHD. The overlap of the factual allegations and legal theories in these actions is near total. The Actions involve the same drug, the same theories of liability, the same injuries, and the same science underpinning the causal relationship between Defendants' APAP products and the plaintiffs' injuries. Common to all of the Actions are questions regarding the causal relationship between prenatal exposure to APAP and ASD and ADHD, the adequateness of Defendants'

warnings of known risks associated with their APAP products, and Defendants' obligations to monitor, evaluate, test, research, and review the risks associated with APAP.

That the Actions name multiple defendants (with more certain to be named in tag-along actions) strengthens the case for centralization because the key issues will be the same across all cases. Every defendant sells an identical over-the-counter APAP product under their respective brand names. The Panel routinely consolidates litigations that involve multiple similarly situated defendants. *See In re: Checking Account Overdraft Litig.*, 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009) ("While there will be some unique questions of fact from bank-to-bank, these actions share sufficient factual questions relating to industry-wide bank posting policies and procedures to warrant centralization of all actions in one MDL docket."); *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1379 (J.P.M.L. 2017) ("Although individualized factual issues may arise in each action, such issues do not—especially at this early stage of litigation—negate the efficiencies to be gained by centralization. The transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims. The alternative of allowing the various cases to proceed independently across myriad districts raises a significant risk of inconsistent rulings and inefficient pretrial proceedings.") *See also In re Zantac (Ranitidine) Prods. Liab. Litig.*, 437 F. Supp. 3d 1368, 1370 (J.P.M.L. 2020) (centralization of personal injury actions and consumer class actions in one transferee district will result in significant efficiencies because of common core factual issues and significant overlap among defendants in both types of actions); *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 793 F. Supp. 1098, 1099–1100 (J.P.M.L. 1992) (centralization of claims against multiple defendants by plaintiffs claiming different injuries).

The common questions of fact concerning the development, manufacture, sale, marketing, and adequacy of warnings of Defendants' APAP products clearly warrant transfer and

coordination. "Centralization under Section 1407 is necessary" when "actions involve common factual allegations concerning the alleged adverse side effects of [a drug], and the timeliness and adequacy of defendants' warnings concerning those side effects." *In re Mirapex Prods. Liab. Litig.*, 493 F. Supp. 2d 1376, 1377 (J.P.M.L. 2007); *See also In re: Darvocet, Darvon and Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1380 (J.P.M.L. 2011) (transfer and coordination merited where common factual issues relating to whether medications "were defectively designed and marketed" and "whether defendants knew or should have known of the increased risk of [injury] with these medications and failed to provide adequate warnings of them").

### B. Centralization of the Actions Will Promote the Just and Efficient Conduct of the Actions and Will Serve the Convenience of the Parties and Witnesses

To determine whether a transfer would promote the just and efficient conduct of the Actions, the Panel must consider multiple factors, including (1) avoidance of inconsistent rulings between cases, (2) prevention of duplicative discovery on common issues, (3) avoidance of undue burden and expense on the parties, and (4) promoting efficiency and judicial economy. *See e.g.* 4 MANUAL FOR COMPLEX LITIGATION, § 20.13, FEDERAL JUDICIAL CENTER (2004) (Transfer appropriate when it will promote "the convenience of the parties and witnesses and will promote the just and efficient conduct of such actions"); *see also* e.g. *In re Bristol Bay, Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506–507 (J.P.M.L. 1976). Here, these factors decisively favor of centralization.

Transfer and coordination of the Actions before a single judge will ensure the most efficient management of this litigation. These Actions will turn upon common questions of fact, including whether Plaintiffs have adequately established causation of ADHD and ASD by defendant's

products, whether Defendants knew or should have known of the risks of injury that their products posed to mothers and their unborn children, and whether Defendants failed to satisfy their duty to warn the public of the risks posed by their products. These questions are common to each and every Action. And these questions will be answered through fact and expert discovery that is bound to be extensive, time-consuming, costly, and if the Actions are not coordinated, duplicative.

The number of actions that counsel expect will be filed on behalf of those who were harmed as a result of taking APAP during pregnancy makes centralization especially important. Many of the plaintiffs' counsel representing plaintiffs listed in the attached Schedule of Actions have already met informally to analyze and assess the merits of these cases and to assess their suitability for consolidation under Section 1407. Given the pervasive use of APAP by pregnant mothers and the prevalence of ASD and ADHD, counsel believe that it is virtually certain that tens of thousands, if not hundreds of thousands, of similar follow-on actions are likely to be filed in federal district courts throughout the country. Indeed, counsel anticipate that this will be one of the largest multi-district litigations in the history of the United States. It is a monumental undertaking. The MDL system exists precisely to handle this type of complex mass litigation in an efficient and fair manner, one that avoids unnecessary duplication of effort and minimizes the risk of inconsistent rulings that would result should these cases proceed individually through pretrial proceedings in scores of different federal courts. *See In re Camp Lejeune, N.C. Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011) (considering the potential for "a large number of additional related actions to be filed" as a factor weighing in favor of centralization); *See also In re: Trib. Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d 1371, 1372 (J.P.M.L. 2011) ("Given the number of pending actions, centralization likely will result in a significant savings of time and money for the parties and the courts.")

Even if the anticipated flood of follow-on cases somehow fails to materialize, however, the Actions would still warrant and benefit substantially from consolidation. Indeed, this Panel routinely orders transfer and consolidation where even only a handful of actions are pending. *See, e.g.*, *In re Starmed Health Pers. FLSA Litig.*, 317 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004) (centralization of two actions and one potential tag-along "necessary in order to eliminate duplicative discovery; prevent inconsistent rulings on pretrial motions, including those with respect to whether the actions should proceed as collective actions; and conserve the resources of the parties, their counsel and the judiciary."). *See also In re First Nat'l Collection Bureau, Inc.*, 11 F. Supp. 3d 1353, 1354 (J.P.M.L. 2014) (explaining that "[a]lthough there are relatively few parties and actions at present, efficiencies can be gained from having these actions proceed in a single district"); *In re Porsche Cars N. Am., Inc.*, 787 F. Supp. 2d 1349, 1360 (J.P.M.L. 2011) (consolidating three pending actions in two districts); *In re Toys "R" Us-Del., Inc., Fair Accurate Credit Transactions Act (FACTA) Litig.*, 581 F. Supp. 2d 1377, 1378 (J.P.M.L. 2008) (consolidating two pending actions in two districts); *In re Milk Antitrust Litig.*, 530 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008) (consolidating four pending actions in two districts); *In re Camp Lejeune*, 763 F. Supp. 2d at 1381–82 (consolidating four pending actions in four districts).

That the Actions are in their infancy, having been filed between June 1 and June 9, does not counsel against consolidation. As the Panel has recognized, prompt consolidation minimizes the risk of inconsistent rulings. *See Id.* at 1382 ("We decline to delay centralization, as it only invites inconsistent rulings, a result that Section 1407 is designed to avoid."). Early consolidation is particularly appropriate where, as here, none of the Actions has progressed to the point, where a party will be prejudiced by transfer and consolidation. No motion practice has taken place in any case, and no party has yet had an opportunity to begin discovery. The relative immaturity of the

Actions thus puts them in the optimal posture to derive the full benefits of transfer under Section 1407.

Centralizing the Actions and follow-on cases will also prevent the uncertainty and confusion that would result from inconsistent pretrial rulings on the same or similar issues, including such matters as expert discovery and disputes under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiffs in this litigation will necessarily be seeking to obtain essentially the same discovery from defendants. Multiple actions would involve depositions of the same expert witnesses and officers, productions of the same documents, and the same written discovery requests in jurisdictions around the country. For example, each plaintiff would need to seek documents and deposition testimony related to the testing, design, manufacturing, labeling, marketing, and safety of APAP products and defendants' research into and evaluation of the risks of prenatal exposure to APAP. Defendants will likewise undoubtedly engage in motions practice seeking dismissal, summary judgment, and/or other forms of pretrial relief. Coordinating such motions practice and discovery before one judge will avoid overlapping and duplicative requests, promote an organized and coherent approach to discovery and motions practice, and minimize the costs in time, money, and effort that plaintiffs, defendants, and the courts would otherwise have to devote to the helter-skelter pretrial proceedings that would result were the cases allowed to proceed on separate schedules and in separate courts. *See In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374, 1376 (J.P.M.L. 2011) ("Centralization under Section 1407 will eliminate duplicative discovery, [and] prevent inconsistent pretrial rulings on Daubert and other pretrial issues . . . ."); *In re Transocean Tender Offer Sec. Litig.*, 415 F. Supp. 382, 384 (J.P.M.L. 1976) ("[T]he likelihood of motions for partial dismissal and summary judgment in all three actions grounded at least in part on [a common issue]

makes Section 1407 treatment additionally necessary to prevent conflicting pretrial rulings and conserve judicial effort."). Consolidating litigation in one court benefits the parties by allowing counsel for plaintiffs and defendants to "combine their forces and apportion their workload in order to streamline the efforts of the parties, their counsel and the judiciary." *In re: Trib. Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d at 1372. "This streamlining combined with uniform case management will lead to an overall savings in transaction costs." *Id.*

In sum, consolidation of the Actions before a single court at this stage of the litigation will prevent inconsistent judicial rulings, eliminate duplicative discovery and motions practice, increase convenience to all parties, witnesses and their counsel, and would conserve the resources of the judiciary, the parties and their counsel. *See, e.g., In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d 1378, 1379 (J.P.M.L. 2018) (highlighting that consolidation will eliminate duplicative discovery; prevent inconsistent pretrial rulings on Daubert issues and other pretrial matters; and conserve resources); *see also In re MLR, LLC, Patent Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003) (noting that consolidation before a single transferee judge allows for consideration of "all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate activity that has already occurred or is occurring in other actions."). The Panel should accordingly grant Plaintiffs' motion for transfer and consolidation.

**II.    This Panel Is Uniquely Suited to Select the Most Appropriate Transferee Forum for Transfer and Consolidation of the Actions**

As demonstrated above, the many Actions already filed, not to mention the innumerable Actions surely to be filed in the days ahead, are truly national in scope, with parties and their counsel dispersed coast-to-coast across the United States. The defendants are unusually numerous and geographically widespread. Due to the ubiquity of APAP use, and the number of current and

potential defendant sellers of APAP, no single district has a uniquely strong interest in the adjudication of this litigation. Indeed, "[g]iven the wide dispersal of these actions across the country, no forum stands out as a focal point for this litigation." *In re: Trib. Co. Fraudulent Conv. Litig.*, 831 F. Supp. 2d at 1372.

To determine the appropriate district court for transfer, the Panel evaluates several factors, including the number of cases pending in potential transferee courts, the site of the occurrence of common facts, the accessibility of the court, the locations of parties and witnesses, the minimization of cost and inconvenience, the caseload of the transferee judge, and the transferee judge's experience in managing complex litigation. *See, e.g., In re Vision Service Plan Tax Litig.*, 484 F. Supp. 2d 1356, 1357 (J.P.M.L. 2007) ("we are assigning this litigation to an experienced jurist with the ability to steer this litigation on a prudent course").

Instead of boring this panel with self-serving ruminations about (1) where the defendants' documents are in an age of digital production of them, (2) where one's favorite airport is located in a country full of capable airstrips, (3) where the multitude of defendants' witnesses are in a litigation to be brought by an omnipresent plaintiff population of mothers located across our country, with pregnancy usage and child diagnosis witnesses located everywhere, and (4) why one judge known to the Movant is better than all the other capable federal judges available to this Panel across the landscape of Article III excellence, Movant instead will respectfully leave to this Panel the selection of a capable transferee judge[5]. After all, 28 U.S.C. §1407 expressly makes that the Panel's job rather than a single movant's prerogative.

In sum, and in all seriousness, an experienced transferee judge with the proper combination of experience, expertise, and capacity to effectively and efficiently manage this litigation would

---

[5] Because this Court requests a suggested transferee Court, Plaintiffs suggest the Northern District of California.

16

be appropriate here. Transfer of the APAP cases to such a judge selected by this Panel would benefit the parties and their counsel and would promote the just and efficient management of this litigation.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Panel grant the motion for transfer, coordination, and consolidation under 28 U.S.C. § 1407, and transfer the above-mentioned Actions and all subsequently filed follow-on actions to a single District Court selected by this Panel.

Dated: June 10, 2022    Respectfully submitted,

/s/ *Mikal C. Watts*
Mikal Watts (Federal ID 12419)
Texas State Bar No. 20981820
WATTS GUERRA LLC
Millennium Park Plaza RFO, Suite 410, C112
Guaynabo, Puerto Rico 00966
Phone: (210) 447-0500
Fax: (210) 447-0501
Email: mcwatts@wattsguerra.com

**ATTORNEY FOR PLAINTIFFS AUJENAI THOMPSON, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF J.D., A MINOR**